JEFF D. FRIEDMAN (173886)
jefff@hbsslaw.com
SHANA E. SCARLETT (217895)
shanas@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001

KASSRA P. NASSIRI (215405)
knassiri@nassiri-jung.com
CHARLES H. JUNG (217909)
cjung@nassiri-jung.com
NASSIRI & JUNG LLP
251 Kearny Street, Suite 501
San Francisco, CA  94108
Telephone: (415) 373-5699
Facsimile:  (415) 534-3200

Co-Lead Class Counsel

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NEW CENTURY INTERNATIONAL CORPORATION, a Nevada corporation d/b/a NATURAL AREA RUGS, Individually and on Behalf of All Others Similarly Situated,<br><br>                                        Plaintiff,<br><br>        v.<br><br>VALUECLICK, INC., a Delaware Corporation, Its Wholly-Owned Subsidiary COMMISSION JUNCTION, INC., and Its Wholly-Owned Subsidiary BE FREE,<br><br>                                        Defendants. | No. 07-cv-02638-FMC (CTx)<br><br><u>CLASS ACTION</u><br><br>NOTICE OF MOTION AND PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT<br><br>Judge:   Hon. Florence-Marie Cooper<br>Date:    January 5, 2009<br>Time:    10:00 a.m.<br>Place:   Courtroom 750 (Roybal)<br><br>ACTION FILED:  April 20, 2007 |

1

**NOTICE OF MOTION AND MOTION**

2

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

3

PLEASE TAKE NOTICE that on January 5, 2009 at 10:00 a.m. or as soon

4 thereafter as counsel may be heard at the United States District Court, located at 255

5 East Temple Street, Los Angeles, California in Courtroom 750, the Honorable

6 Florence-Marie Cooper presiding, Plaintiffs will and hereby do make a motion for

7 final approval of the settlement set forth in the Agreement for Settlement of Carrier

8 and NAR Litigation, filed herewith.  Plaintiffs' motion is based on this notice of

9 motion, the memorandum of points and authorities, the Settlement Agreement, the

10 Declaration of Jeff D. Friedman, the declarations of the named plaintiffs and such

11 additional evidence or argument as may be considered by the Court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- i -

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ....................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ..................................... 2

      A.    Brief Summary of Facts and Claims ...................................... 2

      B.    The Litigation ........................................................................ 4

      C.    Settlement Negotiations ........................................................ 5

      D.    The Settlement Agreement .................................................... 6

            1.    The Settlement Classes ............................................... 7

            2.    Monetary Benefits to Class Members ........................ 7

            3.    Injunctive Component ................................................. 8

      E.    Notice to Class Members ....................................................... 9

      F.    Claims and Settlement Administration ................................ 10

III.  ARGUMENT .......................................................................................... 11

      A.    The Settlement Should be Approved as Fair, Reasonable and
            Adequate .............................................................................. 11

            1.    The Strength of Plaintiffs' Case ............................... 12

            2.    The Risk, Expense, Complexity and Likely Duration of
                  Further Litigation .................................................... 13

            3.    The Risk of Maintaining Class Action Status Throughout
                  the Trial .................................................................... 15

            4.    The Amount Offered in Settlement ........................... 15

            5.    The Extent of Discovery Completed and the Stage of the
                  Proceedings .............................................................. 16

            6.    The Experience and Views of Counsel ...................... 17

            7.    The Reaction of the Class Members to the Proposed
                  Settlement ................................................................. 19

            8.    Absence of Collusion in the Settlement Process ...... 20

      B.    The Settlement Class Should Be Finally Certified .............. 21

            1.    The Settlement Classes Satisfy the Prerequisites of Rule
                  23(a) ......................................................................... 21

- ii -

2.    The Settlement Classes Satisfy the Prerequisites of Rule 23(b)(3) ........................................................................ 24

C.    The Court Should Appoint Plaintiffs' Counsel as Class Counsel ....... 25

IV.    CONCLUSION ............................................................................. 25

001969-12 271648 V1

1

**TABLE OF AUTHORITIES**

2

<u>PAGE</u>

3

**FEDERAL CASES**

4

*Akiona v. U.S.,*
   938 F.2d 158 (9th Cir. 1991) ................................................................ 13

5

*Amchem Products v. Windsor, Inc.,*
   521 U.S. 591 (1997) ................................................................ 21, 22

6

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) ................................................................ 22, 24

7

8

*Boyd v. Bechtel Corp.,*
   485 F. Supp. 610 (N.D. Cal. 1979) ................................................................ 20

9

*Churchill Village, L.L.C. v. General Elect.,*
   361 F.3d 566 (9th Cir. 2004) ................................................................ 11

10

11

*Class Plaintiffs v. Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ................................................................ 11

12

*Glass v. UBS Financial Services, Inc.,*
   2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ................................................................ 20

13

14

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................ *passim*

15

*Hanrahan v. Britt,*
   174 F.R.D. 356 (E.D. Pa.1997) ................................................................ 18

16

17

*Harris v. Palm Springs Alpine Estates, Inc.,*
   329 F.2d 909 (9th Cir. 1964) ................................................................ 22

18

*In re Heritage Bond Litig.,*
   2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ................................................................ 11

19

20

*In re Independent Energy Holdings PLC, Sec. Litig.,*
   210 F.R.D. 476 (S.D.N.Y. 2002) ................................................................ 22

21

*Lubin v. Sybedon Corp.,*
   688 F. Supp. 1425 (S.D. Cal. 1988) ................................................................ 23

22

23

*In re Mego Finance Corp. Sec. Litig.,*
   213 F.3d 454 (9th Cir. 2000) ................................................................ 15

24

*In re NASDAQ Market-Makers Antitrust Litig.,*
   187 F.R.D. 465 (S.D.N.Y.1998) ................................................................ 15

25

26

*In re Pacific Enterprises Sec. Litig.,*
   47 F.3d 373 (9th Cir. 1995) ................................................................ 18

27

28

- iv -

*National Rural Telecom. Cooperative  v. Directv,*
  221 F.R.D. 523 (C.D. Cal. 2004) ................................................... 13, 14, 18, 19

*Officers for Justice v. Civil Serv. Commission,*
  688 F.2d 615 (9th Cir. 1982) ................................................................... 12, 16

*Rodriguez v. West Pub. Corp.,*
  2007 WL 2827379 (C.D. Cal., Sept. 10, 2007) ......................................... 12, 15

*Torrisi v. Tucson Electric Power Co.,*
  8 F.3d 1370 (9th Cir. 1993) ...................................................................... 10, 11

*In re United Energy Corp. Solar Power Modules Tax Shelter Investment Sec. Litig.,*
  122 F.R.D. 251 (C.D. Cal. 1988) ............................................................ 21, 23

*Van Bronkhorst v. Safeco Corp.,*
  529 F.2d 943 (9th Cir.1976) ...................................................................... 14, 17

*In re Warfarin Sodium Antitrust Litig.,*
  212 F.R.D. 231 (D. Del. 2002) ................................................................. 13, 16

*Weinberger v. Jackson,*
  102 F.R.D. 839 (N.D. Cal. 1984) ..................................................................... 23

*Wilson v. Airborne, Inc.,*
  2008 WL 3854963 (C.D. Cal. Aug. 13, 2008) ......................................... 19, 20

## FEDERAL STATUTES

Federal Rule of Civil Procedure 23 ................................................... *passim*

# I.     INTRODUCTION

Plaintiffs submit this motion for final approval of a settlement in two consolidated class actions brought on behalf of certain advertisers and publishers who entered into agreements with Defendants for affiliate marketing services on Defendants' networks.

After months of intensive, arm's-length negotiations, conducted with the assistance of the Honorable Edward Panelli (Ret.), the parties to the case – including Plaintiffs Mireille Carrier and New Century International Corporation d/b/a Natural Area Rugs ("Natural Area Rugs"), acting on their own behalf and on behalf of two proposed classes of similarly-situated persons, and Defendants ValueClick, Inc., Commission Junction, Inc. ("Commission Junction") and Be Free (collectively "Defendants") – have agreed to a settlement of all claims asserted against Defendants.

The Settlement Agreement will produce real and substantial benefits for the affected Advertiser and Publisher classes, and constitutes an excellent resolution of a case of substantial complexity.[1]  Among other terms, the settlement provides for an immediate payment of $1 million to the Advertiser and Publisher classes and adoption of extensive and sophisticated online corporate governance measures, including:  (1) the appointment of an independent auditor to perform an audit of Commission Junction's practices, systems and network quality efforts; (2) implementation of a proprietary automated software investigative tool designed to detect the use of known malicious software applications; and (3) a mandatory requirement that Defendants shall maintain, for a period of no less than 3 years, certain data related to publisher investigations, publisher terminations and publisher

---

[1]     "Settlement Agreement" refers to the Agreement for Settlement of Carrier and NAR Litigation, attached as Exhibit A to the Declaration of Jeff D. Friedman in Support of Motion for Final Approval of Settlement, An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards ("Friedman Decl."), filed concurrently herewith.  Unless otherwise indicated, all terms used herein shall have the same meaning as set forth in the Settlement Agreement.

- 1 -

1   software application testing.  In addition, Defendants have agreed to pay fees and

2   expenses to Plaintiffs' Counsel separately, without any reduction in recovery to the

3   Settlement Classes, subject to Court approval.

4        Plaintiffs hereby move the Court for final approval of the settlement pursuant

5   to Rule 23(e) of the Federal Rules of Civil Procedure.  The settlement is eminently

6   fair, reasonable and adequate to the Advertiser and Publisher classes, and was

7   reached after months of intensive negotiations and review of Defendants' process of

8   investigating publishers for the use of prohibited software on the Defendants' online

9   affiliate marketing network.  Accordingly, Plaintiffs ask the Court to enter the

10  [Proposed] Order (a) granting final approval of the proposed settlement;

11  (b) certifying the proposed plaintiff classes pursuant to Rule 23(b)(3) for purposes of

12  the settlement; and (c) appointing the petitioning Plaintiffs and their counsel as lead

13  plaintiffs and class counsel, respectively.

14  ## II.   FACTUAL AND PROCEDURAL BACKGROUND

15  **A.    Brief Summary of Facts and Claims**

16       Defendants own and operate online affiliate marketing networks.  Affiliate

17  marketing is a practice by which an online publisher agrees to place an advertiser's

18  advertisement or hyperlink in the publisher's material in exchange for receiving a

19  commission whenever a consumer end user clicks on the hyperlinked advertisement

20  and consummates a transaction on the advertiser's Web site.  Publishers place

21  advertisers' offers (and links to the advertisers' Web sites) on their own Web sites in

22  order to drive consumers to the advertisers' Web sites.  Advertisers then compensate

23  publishers, typically through a commission, whenever these consumers make a

24  purchase on the advertisers' Web sites.  Defendants' affiliate marketing network

25  tracks and accounts for legitimate transactions so that advertisers can compensate

26  publishers for the successful "click-throughs" that lead to consummated transactions.

27

28

- 2 -

As part of the services offered to advertisers and publishers, Defendants promise to track consumers' clicks and actions as those consumers move from publishers' Web sites to advertisers' Web sites. Depending upon the terms of the specific contract, Defendants may also be responsible for: (1) calculating the commissions owed by advertisers to publishers; (2) providing a complete accounting to advertisers and publishers; and (3) collecting and distributing commission payments from advertisers to publishers.

Adware is a significant threat to Defendants' business model. Adware refers to software programs designed to interfere with affiliate marketing tracking systems, and ultimately, to steal or divert affiliate commissions. Adware programs are installed on consumers' computers by third parties, usually surreptitiously and without the consumers' knowledge.

In a typical adware transaction, an end-user visits a legitimate publisher's page, clicks on an advertisement, and passes through to the advertiser's page (the "click-through"). At the time of the click-through, a cookie is dropped identifying, among other things, the end-user, the advertiser, the publisher and the date and time.[2] After this initial cookie has been dropped, adware forces or hijacks the end-user's computer and inserts its own publisher identification number into the cookie on the end-user's computer. As a result, an adware entity can steal the legitimate publisher's commission. *See, e.g.,* FAC, ¶ 16.[3]

To foster trust between advertisers and publishers (and thereby market its services), Defendant Commission Junction affirmatively represented that it prohibits the use of adware on its networks, and that any party violating those prohibitions

---

[2]  A cookie is a parcel of text sent by a server to a Web client (usually a browser) and then sent back unchanged by the client each time it accesses that server. *See* http://en.wikipedia.org/wiki/HTTP_cookie (last accessed Oct. 9, 2008).

[3]  "FAC" refers to First Amended Complaint for: (1) Breach of Contract; (2) Unjust Enrichment; and (3) Unfair Business Practices (California Business & Professions Code 17200, *et seq.* (filed Nov. 13, 2008, Ct. Rec. 37).

- 3 -

1    would be terminated.  In December 2002, Defendants instituted a Code of Conduct

2    to codify their stated policy.  Defendants required all publishers and advertisers to

3    enter into agreements requiring, among other things, that they adhere to restrictions

4    contained in those agreements and in the Code of Conduct prohibiting the use of

5    adware.  Yet, despite Defendants' purported efforts at monitoring their networks and

6    ensuring compliance with these agreements, adware on the Defendants' affiliate

7    networks persisted.  *See id.*, ¶ 47.

8    **B.     The Litigation**

9          On April 20, 2007, after extensive pre-filing factual investigation, Plaintiffs

10   Settlement Recovery Center, LLC ("Settlement Recovery Center") and Mireille

11   Carrier filed two separate class action lawsuits in this Court against Defendants.  The

12   complaints were filed on behalf of: (1) advertisers whom Defendants allegedly

13   caused to improperly pay commissions to adware entities; and (2) publishers whom

14   Defendants allegedly deprived of rightful commissions.  *Id.*, ¶ 79; *Carrier* FAC,

15   ¶ 79.[4]

16         Plaintiffs contended that Defendants breached their primary obligation to

17   Plaintiffs by improperly accounting for transactions and causing advertisers to pay

18   commissions to parties other than the publishers who originated those transactions.

19   *Id.*, ¶¶ 37-47.  Plaintiffs alleged Defendants failed to detect and identify transactions

20   that were hijacked by adware entities, despite being the only parties to the

21   transactions capable of detecting and identifying the fraud.  *Id.*, ¶¶ 31-36, ¶¶ 56-60.

22   Plaintiffs also alleged that Defendants breached their promise to enforce the Code of

23   Conduct and other adware prohibitions.  *Id.*, ¶¶ 87-98.

24         On June 13, 2007, Defendants moved to dismiss the complaints.  Defendants

25   argued that they had no legal obligation or duty to detect particular instances of

26   commission theft because the contracts between Defendants and Plaintiffs expressly

27   ───────────────────
       [4]   "*Carrier* FAC" refers to the First Amended Complaint, filed in *Carrier v. ValueClick Inc,*
28   *et al.*, No. 2:07-cv-02641-FMC-CTx (filed Sept. 12, 2008, Ct. Rec. 33).

1   disclaimed such liability.[5]   Notwithstanding the lack of a duty, Defendants

2   represented they did make efforts to investigate non-compliant behavior and either

3   educated or removed violators from their networks, such that any remaining

4   instances of adware or commission theft were trivial.   *Id.* at 21.

5         On August 27, 2007, this Court denied in part and granted in part Defendants'

6   motions to dismiss, dismissing the claim for negligence but upholding all other

7   claims in the *Settlement Recovery Center* action, and upholding all claims in the

8   *Carrier* action.   Defendants' motions to strike were denied in their entirety.   On

9   November 13, 2007, Plaintiff Settlement Recovery Center filed a first amended

10  complaint, alleging breach of contract, unjust enrichment and violations of

11  California's Unfair Practices Act, and also added Plaintiff Natural Area Rugs.   On

12  November 15, 2007, Plaintiff Carrier filed a first amended complaint alleging breach

13  of contract, negligence and violation of California's Unfair Competition Law.   On

14  January 14, 2008, the two actions were consolidated by order of this Court.

15  **C.      Settlement Negotiations**

16        In or about November 2007, the parties began to discuss informally

17  exchanging information to better assess the merits and potential damages in the case.

18  In exchange for Defendants' agreement to provide specific information, Plaintiffs

19  agreed to a stay of formal discovery.   Friedman Decl., Ex. A at ¶¶ 27, 83.   On

20  February 12, 2008, the parties held an all-day settlement meeting at Defendants'

21  offices in Santa Barbara.   At all times these discussions were at arm's length and

22  hard fought.   Attending the meeting were counsel for all parties, Todd Miller,

23  Commission Junction's Director of Support Operations, Anders Bjoras, Commission

24  Junction's Vice President of Engineering and Plaintiffs' non-testifying technical

25  consultant.   The parties' primary concern during the course of these intensive and

26  lengthy arm's-length discussions was to evaluate each other's positions and to

27  _____

      [5]   *See* Notice of Motion and Motion to Dismiss Class Action Complaint; Memorandum of
28  Points and Authorities in Support (filed June 13, 2008, Ct. Rec. 11), at 10.

- 5 -

1   identify changes in Defendants' business operations that would reduce the risk of

2   commission theft and other harms to publishers and advertisers resulting from the

3   use of adware on Defendants' affiliate networks.  Friedman Decl., ¶ 10.

4          After these extensive discussions concerning the facts, merits and potential

5   damages in the case, on February 25, 2008, the parties engaged in mediation in San

6   Francisco before the Honorable Edward Panelli (Ret.).  At the conclusion of the all-

7   day session, Justice Panelli made a "mediator's proposal" for settlement and asked

8   that the parties either accept or reject the proposal within one week.  After

9   subsequent negotiations regarding the terms of the injunctive relief, each party

10  accepted Justice Panelli's proposal and agreed to a settlement of all claims asserted

11  against the Defendants.  *Id.*, ¶ 11.

12         As part of these discussions, and over the course of more than four months,

13  Defendants produced to Plaintiffs two preliminary damages analyses, one for each

14  action, an additional set of disclosures in response to questions posed by Plaintiffs,

15  and the deposition and subsequent declaration of Anders Bjoras and a declaration

16  from a member of Defendants' Network Quality department describing Defendants'

17  adware detection efforts prior to this settlement.  *Id.*, ¶ 8.

18  **D.     The Settlement Agreement**

19         This settlement is laudable not only because of the substantial amount of

20  monetary relief, notwithstanding the difficulty of proving damages, but also because

21  it is structured to provide for significant reforms to Defendants' practices.  In

22  exchange for said monetary and injunctive relief, members of two Settlement Classes

23  will release all "Released Claims" relating to or arising from Non-Compliant

24  Software use on Defendant Commission Junction's networks.  *Id.*, Ex. A at ¶ 17.

25

26

27

28
                                        - 6 -

1    **1.    The Settlement Classes**

2    The proposed settlement has been reached on behalf of two separate settlement

3    classes, one consisting of Advertisers and the other consisting of Publishers, defined

4    in the Settlement Agreement as follows:

5    **a.    Advertiser Settlement Class:**

6    All Advertisers who, between April 20, 2003 and July 22,
     2008, had ads hosted by Publishers on and/or paid

7    commissions for ads placed through, Defendants' online
     affiliate marketing network.

8    **b.    Publisher Settlement Class:**

9    All Publishers who, between April 20, 2003 and July 22,

10   2008, hosted ads on behalf of Advertisers in, and/or
     received commissions for participating as a publisher in,

11   Defendants' online affiliate marketing network.

12   *Id.*, Ex. A at ¶¶ 2, 16.

13   **2.    Monetary Benefits to Class Members**

14   As consideration for the settlement, Defendants have agreed to provide a

15   broad package of settlement benefits to the Settlement Classes.  The settlement

16   benefits include Common Funds of approximately $1 million, to be distributed as

17   follows:[6]

18   •    Approximately 70% of the Common Funds will be allocated to the

19   Publisher Fund.  The pro rata share of the Publisher Fund owed to each

20   eligible Publisher shall be equal to that Publisher's received

21   commissions as a percentage of total commissions received by all

22   Publishers during the class period.

23   •    Approximately 30% of the Common Funds will be allocated to the

24   Advertiser Fund.  The pro rata share of the Advertiser Fund owed to

25

26   [6]    The Settlement Agreement provides for certain costs to be paid out of Common Funds prior
     to any distributions to the Settlement Classes.  Friedman Decl., Ex. A at ¶ 42.  To minimize

27   administrative costs, the parties have agreed that all claims of less than $1.00 will revert to the
     common fund and will be distributed to the remaining class members.  *Id.*, Ex. A at ¶¶ 43-44.

28

- 7 -

1                      each eligible Advertiser shall be equal to that Advertiser's paid

2                      commissions as a percentage of the total commissions paid by all

3                      Advertisers during the class period.

4  *Id.*, Ex. A at ¶ 42.

5        The settlement fund is also non-reversionary, such that any amount remaining

6  after distribution of the total claim amount would be distributed *cy pres* to a

7  charitable organization designated by the parties.  *Id.*, Ex. A at ¶ 46.

8       **3.    Injunctive Component**

9        The settlement also contains substantial injunctive relief requiring certain

10  corporate governance reforms and increased detection of malicious adware on

11  Defendants' affiliate networks.  Among these reforms, Defendants have agreed to do

12  the following:

13       <u>Independent Audit</u>:  Defendants will retain, at their own expense, a qualified,

14  independent auditor to perform an audit of Defendants' practices, systems and

15  network quality efforts with respect to the prevention and detection of, and response

16  to, third parties' use of adware.  The auditor shall provide a report to counsel for all

17  parties containing his or her findings and proposing recommendations for improving

18  or enhancing Commission Junction's prevention, detection and response to adware

19  use.  *Id.*, Ex. A at ¶ 48.

20       <u>Automated Software Investigative Tool</u>:  Defendants will implement an

21  automated testing protocol utilizing a proprietary software tool designed to detect

22  particular publishers' use of known malicious software applications.  The tool will

23  run on a continuous basis, and the independent auditor will be permitted to evaluate

24  the automated tool and to make recommendations concerning the design and

25  implementation of the automated tool in his or her report.  *Id.*, Ex. A at ¶ 51.

26       <u>Preservation of Information During Fraud Investigations</u>:  Defendants will

27  implement an automated system for preserving all "click data" associated with a

28

particular publisher while that publisher is under investigation for the potential use of malicious software on Commission Junction's network.  *Id.*, Ex. A at ¶ 52.

Tracking of Information Related to Fraud Investigations:  Defendants shall maintain, for a period of no less than 3 years, certain data related to publisher investigations, publisher terminations and publisher software application testing. These data will allow for a more robust audit of Defendants' efforts to prevent, detect and respond to adware.  *Id.*, Ex. A at ¶ 49.

Additional Investigative Tools:  Defendants will assign a member of the Network Quality department to be "principally responsible" for reviewing reports related to adware usage.  Defendants will also circulate a weekly "high conversion report" to all members of its Network Quality team in an effort to discover potential forced clicks and commission theft caused by adware.  *Id.*, Ex. A at ¶ 50.

Finally, after implementation of the above-described terms, and subject to the Court's final determination, Defendants have agreed to pay Plaintiffs' Counsel fees and expenses up to $500,000, representing $475,000 in fees and $25,000 in expenses.  *Id.*, Ex. A at ¶ 55.  This payment is separate and apart from the Common Funds and will not reduce the amount of funds available to the Settlement Classes.

**E.    Notice to Class Members**

The parties disseminated to the Settlement Classes a Long-Form Notice, an E-mail Notice and a Postcard Notice, notifying them of the terms of the settlement and of their rights in connection therewith.  Friedman Decl., Exs. B-D.  The parties agreed, and this Court concurred, that because all members of the Settlement Classes necessarily maintained an e-mail address to communicate with Defendants during the class period, notice by electronic mail was especially appropriate here.  In the event that e-mail notice to any class member "bounced back" or was otherwise identified as having been undeliverable to the recipient's e-mail server, or if no

- 9 -

1    e-mail address could be located, the Claims Administrator sent Postcard Notice by

2    standard U.S. mail or Priority Mail International, postage prepaid. *Id.*, Ex. A at ¶ 61.

3        Defendants also established a designated Web site that contains the full text of

4    the Settlement Agreement, the Long-Form Notice, the Preliminary Approval Order

5    and other relevant orders of the Court, and contact information for Plaintiffs'

6    counsel.[7]  Defendants secured nationwide access to the settlement Web site by

7    registering the site with Google so that appropriate queries on Google would yield a

8    link to the Web site.  The Web site was also referenced on the E-mail and Postcard

9    notices.  Friedman Decl., Exs. C-D.  Notice by e- mail, U.S. mail and publication on

10   the Internet, as preliminarily approved by this Court, satisfies the requirements of

11   due process.  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75 (9th Cir.

12   1993).

13   **F.     Claims and Settlement Administration**

14       Administration of the class claims was designed with the expertise of Epiq

15   Systems ("Epiq"), an experienced claims administrator, familiar with administering

16   classes with over 100 million class members.  In the administration of the settlement,

17   Epiq was required to, and did, maintain a list of all class members who opted-out of

18   the settlement, and a list of all opt-out requests that were rejected as duplicates, late,

19   or otherwise invalid.  Friedman Decl., Ex. A at ¶ 65.

20       On information and belief, the Settlement Claims Administrator sent notice to

21   approximately 839,926 Class Members.  *Id.*, ¶ 16.  As of November 14, 2008, on

22   information and belief, there have a total of 332 requests for exclusion.  *Id.*[8]  In

23   contrast, only six (6) Class Members submitted objections.  *Id.*; Exs. E-J.

24

25

26   [7]    *See* http://www.cjsettlement.com (last accessed Nov. 23, 2008).

27   [8]    These numbers are estimates, based on the information available to date.  According to the Settlement Agreement, Defendants will cause proof of the mailing of notice to be filed on or before December 8, 2008 (30 days before the Final Approval Hearing), which will contain the final numbers regarding notice, requests for exclusion and class members.  *Id.*, Ex. A at ¶¶ 60-62.

28

- 10 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ARGUMENT

**A.      The Settlement Should be Approved as Fair, Reasonable and Adequate**

The Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).[9]  Federal Rule of Civil Procedure 23(e) dictates that a court should consider the fairness, adequacy and reasonableness of a settlement by balancing many factors, which include:  (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; and (7) the reaction of the class members to the proposed settlement. *Churchill Vill., L.L.C. v. Gen. Elect.*, 361 F.3d 566, 576 (9th Cir. 2004).[10]  The Court may also consider the absence of collusion in the settlement process. *Id.* at 575.  This list is not exclusive and different factors may predominate in different factual contexts. *Torrisi*, 8 F.3d at 1376.  The relative degree of importance of each of these factors varies according to the circumstances of each case and is dictated by the nature of the claim and the type of the relief sought. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

When reviewing these factors, the settlement is entitled to a ***presumption of fairness*** because it was negotiated at arm's length by experienced counsel after significant discovery, a mediation and months of intense settlement discussions. *See In re Heritage Bond Litig.*, MDL No. 02-ML-1475-DT, 2005 U.S. Dist. LEXIS 13555, at *11 (C.D. Cal. June 10, 2005).  A proposed settlement shall not "be judged against a hypothetical or speculative measure of what might have been achieved by

---

[9]    All internal citations and quotations omitted, unless otherwise indicated.

[10]    A separate factor is the presence of a governmental participant, which is not relevant here. *Id.*

the negotiators." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The Court must consider the settlement terms "as is" and cannot rewrite terms or conditions drafted by the parties. *Id.* at 630; *see also Hanlon*, 150 F.3d at 1026 ("The settlement must stand or fall in its entirety.").

As described above, the settlement was reached only after extensive discovery had been conducted. Negotiations occurred at arm's length over four months with the assistance of the Honorable Edward Panelli (Ret.) and the Settlement Agreement was not reached until Defendants committed to significant corporate reform. Class Counsel are experienced in class actions. Friedman Decl., Ex. K; Nassiri Decl., Ex. A.[11] Moreover, only six out of the approximate 839,000 class members to whom notice was sent, submitted objections – a total of .001% of the aggregate classes combined. Friedman Decl., ¶ 16. Thus, the Settlement Agreement enjoys a presumption of fairness. *See Rodriguez v. West Pub. Corp.*, No. 05-cv-3222 R (MCx), 2007 WL 2827379, at * 7 (C.D. Cal., Sept. 10, 2007).

**1.    The Strength of Plaintiffs' Case**

Although Plaintiffs largely prevailed on Defendants' motions to dismiss and believe they would prevail on any future dispositive motion filed by Defendants, whether Plaintiffs would obtain a favorable unanimous jury verdict was far from guaranteed.

Significant obstacles existed to proving liability. There was a risk that the Court would agree with Defendants that the contract language precluded the classes' claims, or the Defendants' actions were sufficient to discharge their duty (if any) to the class. Furthermore, even if Plaintiffs prevailed on liability, Plaintiffs might not prevail on damages because Defendants' practice was not to retain the raw transaction data for most of the class period. Friedman Decl., Ex. L at ¶ 2.

---

[11]  "Nassiri Decl." refers to the Declaration of Kassra Nassiri in Support of Motion for Final Approval of Settlement, An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, filed concurrently herewith.

001969-12 271648 V1

(Declaration of Anders Bjoras).  These data were important to track and properly account for each transaction and to establish damages through the class period. Defendants have also represented that they never historically analyzed – on a macro, systemic level – the size and scope of the illegal adware activities on their network. *Id.,* Ex. L at ¶ 15.  In doing so, Defendants effectively blocked two direct avenues of proof of Defendants' liability and class damages.

Although Plaintiffs might be able to draw an adverse inference from Defendants' behavior, an adverse inference alone is in no way a guarantee of proving causation.

> The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document . . . .

*Akiona v. U.S.*, 938 F.2d 158, 161 (9th Cir. 1991).

If Plaintiffs could not establish damages with requisite certainty, their claims would fail, and they would walk away from the litigation empty-handed.  The proposed settlement not only eliminates these risks associated with continued litigation, but also assures that the Settlement Classes will benefit from the prospective injunctive relief contained in the Settlement Agreement.

### 2. The Risk, Expense, Complexity and Likely Duration of Further Litigation

The risk, expense, complexity and duration of continued litigation also favors settlement.  The Court should consider "the probable costs, in both time and money, of continued litigation."  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002).  In most cases, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecom. Coop. v. Directv*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).  Indeed, the Ninth Circuit has noted that settlement is encouraged

- 13 -

1  in class actions where possible:  "there is an overriding public interest in settling and

2  quieting litigation . . . particularly . . . in class action suits which are now an ever

3  increasing burden to so many federal courts and which frequently present serious

4  problems of management and expense."  *Van Bronkhorst v. Safeco Corp.,* 529 F.2d

5  943, 950 (9th Cir.1976).

6       If not for this settlement, the case would likely continue to class certification,

7  discovery, summary judgment and trial.  While counsel for Plaintiffs believe they

8  have a reasonable chance of prevailing on the merits of Plaintiffs' claims, the

9  incursion of additional and very substantial expenses due to extensive and technical

10  discovery, retention of experts, summary judgment and trial would severely deplete

11  even the best-case recovery.  Defendants are represented by a nationally-recognized

12  and prestigious law firm that would mount a vigorous and thorough defense.

13  Defendants are a well-capitalized, public company and one of the largest Internet

14  affiliate marketing companies in the world.  The cost to litigate against such capable

15  and well-funded Defendants would unquestionably be large.  If litigation continues,

16  Plaintiffs reasonably anticipate a hotly-contested motion for class certification,

17  expensive and protracted discovery, competing motions for summary judgment and a

18  lengthy trial.  Appeals could potentially follow, thereby causing further expense,

19  delays and the uncertainties which are inherent in litigating an appeal.  Settlement of

20  the litigation at this time, under the proposed terms, will ensure an immediate

21  recovery for the Settlement Classes, and immediate and ongoing benefits from

22  Defendants' operational reforms, without any further expense incurred on behalf of

23  the Settlement Classes.  Accordingly, final approval of the settlement is warranted.

24  *See Directv*, 221 F.R.D. at 527 ("Avoiding such a trial and the subsequent appeals in

25  this complex case strongly militates in favor of settlement rather than further

26  protracted and uncertain litigation").

27

28

- 14 -

001969-12  271648 V1

3.      **The Risk of Maintaining Class Action Status Throughout the Trial**

As part of the settlement, the parties have agreed to stipulate to certification of the two settlement classes.  Friedman Decl., Ex. A at ¶ 36.  Should the settlement not be approved, however, no doubt exists that any future certification effort would be a vigorously and highly contested battle.  Defendants have already indicated as much to Plaintiffs, and have also disputed whether these actions would be manageable for trial.  Friedman Decl., ¶ 12.  Because the most straight-forward identification of those publishers and advertisers who were harmed by adware would require analysis of the raw transaction data, Defendants' policies of destroying that data presented a significant obstacle to class certification.

While Plaintiffs are confident that they would eventually succeed on any such certification effort, even if a class were certified and the matter proceeded to trial there is no guarantee that Defendants would not move for and obtain decertification of the classes before or during trial.  As noted by one court, if "insurmountable management problems were to develop at any point, class certification can be revisited at any time under Fed. R. Civ. P. 23(c)(1)."  *See In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y.1998).

Finally, even if the Class remained certified throughout the trial and Plaintiffs prevailed, Defendants would surely challenge class certification on appeal.  "If at any point the Class were decertified or certification were reversed on appeal, the Class would recover nothing."  *Rodriguez*, 2007 WL 2827379, at *8.  Thus, this factor also weighs in favor of approving the settlement.

4.      **The Amount Offered in Settlement**

In considering the amount offered in settlement, the Court may also look at the difficulties Plaintiffs would face if litigation proceeds.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  This is a case where even Plaintiffs recognize it would be unusually difficult to estimate damages.  The difficulties are

- 15 -

twofold:  (1) Defendants' pre-lawsuit data retention policies were to destroy the historical data important to proving damages; and (2) it is highly unlikely a perfect system could be devised to detect all adware transactions and give proper credit for those transactions to the rightful publishers.  Friedman Decl., ¶ 13.

The potential risks Plaintiffs faced in proving damages certainly underscores the great result Plaintiffs achieved in negotiating a settlement fund which creates a $1 million non-reversionary cash settlement.  Because of the lack of reliable data, it is hard to estimate how much the Settlement Classes were actually harmed.  In light of the difficulties Plaintiffs would face if litigation proceeded, however, and in addition to the substantial and valuable corporate reform obtained for the benefit of the Settlement Classes, the consideration offered here is clearly adequate and fair.  "[S]ettlement is about compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *In re Warfarin*, 212 F.R.D. at 257 (finding settlement amount representing 33% of maximum possible recovery was well within a reasonable range when compared with recovery percentages in other class action settlements); s*ee also Officers for Justice*, 688 F.2d at 624 ("the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes").

### 5.    The Extent of Discovery Completed and the Stage of the Proceedings

Significant discovery was conducted in this action up to and through the point where settlement was reached.  Friedman Decl., ¶¶ 7-10.  Plaintiffs conducted formal discovery before the parties agreed to a standstill of formal discovery pending settlement discussions, conditioned on receiving information discovery.  The parties exchanged initial disclosures.  Plaintiffs served a combined total of 197 document requests and 27 special interrogatories.  Plaintiffs deposed Anders Bjoras, Commission Junction's Vice President of Engineering, on a variety of technical topics, for which Defendants designated Ander Bjoras.  Defendants received

- 16 -

1    responses to special interrogatories from Plaintiffs Carrier and Settlement Recovery

2    Center.  *Id.*, ¶ 7.

3        During negotiations, Defendants provided substantial informal discovery to

4    Plaintiffs.  This included detailed descriptions of Defendants' business operations,

5    such as its systems and processes related to prevention, detection and response to

6    adware.  Defendants provided Plaintiffs with several thousand pages of sample

7    transaction data, two separate analyses of liability and damages, and one set of

8    disclosures in response to Plaintiffs' follow-up inquiries.  Plaintiffs' technical expert

9    was allowed access to all of this information and worked closely with Plaintiffs'

10   counsel in assessing Defendants' existing systems and processes to prove liability,

11   assessing the available historical data to establish damages, and proposing certain

12   changes in Defendants' systems and processes to prevent future harm from adware.

13   Plaintiffs' technical expert was also allowed to attend an all-day settlement meeting

14   at Defendants' corporate headquarters and participate directly in a highly-technical

15   question-and-answer discussion with high-level employees in charge of Defendants'

16   technical operations.  *Id.*, ¶ 8.

17       "[T]here is an overriding public interest in settling and quieting litigation," and

18   this is "particularly true in class action suits."  *Van Bronkhorst*, 529 F.2d at 950.

19   Settlement spares the parties the costs of protracted litigation and eases the

20   congestion of judicial calendars.  *See id.* at 943.  In light of the extensive discovery

21   and independent factual research conducted by Plaintiffs, and the public policy

22   favoring resolution of class actions by settlement to avoid protracted litigation, this

23   factor also weighs in support of approval.

24       **6.**    **The Experience and Views of Counsel**

25       Plaintiffs have considerable experience in litigating class actions, and other

26   complex litigation.  Friedman Decl., Ex. K; Nassiri Decl. Ex. A.  Counsel Hagens

27   Berman Sobol & Shapiro LLP has a strong history of success in consumer class

28                                         - 17 -

1    actions and complex litigation, and has numerous multi-million dollar settlements

2    similar to this case.  Friedman Decl., Ex. K.

3         In assessing the adequacy of the terms of a settlement, the trial court is entitled

4    to, and should, rely upon the judgment of experienced counsel for the parties.  *See*

5    *Directv*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of

6    counsel, who are most closely acquainted with the facts of the underlying

7    litigation").  The basis for such reliance is that "[p]arties represented by competent

8    counsel are better positioned than courts to produce a settlement that fairly reflects

9    each party's expected outcome in the litigation."  *In re Pacific Enters. Sec. Litig.*, 47

10    F.3d 373, 378 (9th Cir. 1995).  Indeed, when evaluating a proposed settlement, the

11    trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its

12    own judgment for that of counsel.  *See Hanrahan v. Britt*, 174 F.R.D. 356, 366-368

13    (E.D. Pa.1997) (finding that a presumption of correctness applies to a class action

14    settlement reached in arm's length negotiations between experienced, capable

15    counsel after meaningful discovery).

16         Plaintiffs' counsel fully support the settlement, and it is their informed opinion

17    that, given the uncertainty and expense of pursuing Defendants through trial, the

18    settlement is fair, reasonable and adequate and in the best interests of the Settlement

19    Classes.  Friedman Decl., ¶ 17.  The settlement is the product of a mediation

20    conducted by a qualified and experienced former judge, whose informed "mediator's

21    proposal" served as the basis for the settlement.  Based on months of litigating the

22    cases and engaging in formal and informal discovery, the parties understood the

23    strengths and weaknesses of their cases and had sufficient information to support a

24    decision regarding the fairness of the Settlement Agreement.  *Id.*  Approval of the

25    settlement will mean a present recovery for class members.  It will also result in

26    Defendants' immediate implementation of a suite of operational changes aimed at

27    reducing the ongoing harm caused to the Settlement Classes by adware.

28

1       This factor weighs in favor of approving the settlement.

2       **7.      The Reaction of the Class Members to the Proposed Settlement**

3       Notice was delivered by e-mail, first class U.S. mail and Priority Mail

4    International to approximately 839,000 Class Members.  Friedman Decl., ¶ 16.  As

5    of November 14, 2008, there have been approximately 332 requests for exclusion,

6    and only six (6) objections, which amounts to less than .001% of the aggregate

7    classes combined.  *Id.*  The fact that the Settlement Agreement enjoys overwhelming

8    support from the Class supports a finding that the Settlement Agreement is fair,

9    adequate and reasonable.  *See Wilson v. Airborne, Inc.*, No. EDCV 07-770 VAP

10   (OPx), 2008 WL 3854963, at *7 (C.D. Cal. Aug. 13, 2008) (230 opt-outs and 17

11   objections out of a class of 419,606 weighs in favor of approval); *Directv*, 221

12   F.R.D. at 529 ("It is established that the absence of a large number of objections to a

13   proposed class action settlement raises a strong presumption that the terms of a

14   proposed class settlement action are favorable to the class members").

15       Further, only one of the six objectors, Jeffery A. Redding, arguably challenged

16   the settlement terms.  *See* Friedman Decl., Ex. E (Redding Obj.)  Mr. Redding's

17   objection is based on a misconception of the Settlement Agreement's terms.  Mr.

18   Redding states that "I hereby object to this Class Action Settlement because all you

19   are offering to Publishers like me is credit with the Commission Junction."  The

20   Settlement Agreement does provide that publishers with active accounts will be

21   credited amounts due under the settlement.  The credit, however, is equivalent to a

22   credit for an earned commission and entitles the publisher to a cash payment in the

23   full amount of the credit.  Friedman Decl., Ex. A at ¶ 45.  Further, if the publisher's

24   account activity level is insufficient to result in a payout within 180 days of issuance

25   of the credit or the account is inactive, the publisher will receive a check from

26   Defendants in the full amount of the credit.  *Id.*, Ex. A at ¶¶ 45-46.  Thus, the

27   settlement will result in cash payments to publishers.

28

- 19 -

1    Three remaining objectors raised only procedural matters, such as choice of

2  venue for the lawsuit (Switzer Obj.), the particular claims brought (Chanbanyong

3  Obj.) or the amount of a personal damage claims against Defendant Commission

4  Junction (Martins Obj.).  Friedman Decl., Exs. F-H.  Each of these objections does

5  not address the fairness or adequacy of the settlement terms, and the Court should

6  overrule the objections.  *Airborne, Inc.*, 2008 WL 3854963 at *8.  Another would-be

7  objector complains that she did not receive notice of the suit.  *Id.*, Ex. I (Lafrance

8  Obj.).  If she did not receive notice, she is not a class member and therefore has no

9  standing to object.  Another objector requests the repair of her computer, given the

10  damage caused by adware programs.  *Id.*, Ex. J (Ware Obj.).  Claims for damage

11  caused to a computer by adware, however, would lie against the adware affiliate who

12  released the software and not against the Defendants here, who simply provided

13  marketing network services.

14    The relatively low number of objectors supports a finding that the settlement is

15  adequate.  The objection rate here, less than .001%, is exceedingly small when

16  compared with objections rates in other class actions.  *See, e.g., Boyd v. Bechtel

17  Corp.,* 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only

18  16% of the class was persuasive that the settlement was adequate); *Glass v. UBS Fin.

19  Services, Inc.,* No. C-06-4068 MMC, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26,

20  2007) (approving settlement with opt-out rate of approximately 2%).  Accordingly,

21  this factor weighs in favor of approving the settlement.

22    **8.    Absence of Collusion in the Settlement Process**

23    There was no collusion in the settlement of this action.  The parties entered

24  into the Settlement Agreement in good faith, following arms-length negotiation by

25  counsel, including a mediation session with the assistance of the Honorable Edward

26  Panelli (Ret.).  Negotiations took place over many months, were fervent and

27  exhaustive, especially with regards to discovery.  Friedman Decl. ¶¶ 7-14.

28

1    Defendants' agreement to pay up to a certain amount of attorneys' fees and expenses

2    was negotiated separately, at arm's length, and only after the material terms of the

3    settlement had been agreed upon.  Friedman Decl., ¶ 14; Ex. A at ¶ 55.  As a result,

4    this factor also supports approval of the settlement.

5    **B.    The Settlement Class Should Be Finally Certified**

6    **1.    The Settlement Classes Satisfy the Prerequisites of Rule 23(a)**

7    In order to grant final certification of a settlement class, the requirements of

8    Rule 23 must generally be satisfied.  *See* Fed. R. Civ. P. 23; *Hanlon,* 150 F.3d at

9    1019.  As the Court preliminarily found with respect to approval of the Settlement

10   Classes, certification is warranted where, as here, it is demonstrated that the four

11   prerequisites of Rule 23(a), numerosity, commonality, typicality, and adequacy of

12   representation, and one of three requirements of Rule 23(b), are satisfied.  *Id.*  In

13   certifying a settlement class, the Court is not required to determine whether the

14   action, if tried, would present intractable management problems.  *Amchem Prods. v.*

15   *Windsor, Inc.,* 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-

16   only class certification, a district court need not inquire whether the case, if tried,

17   would present intractable management problems . . . for the proposal is that there be

18   no trial.").  Rather, the Court has great discretion in determining whether to certify a

19   settlement class.  *Id.* at 624.

20   As set forth in the proposed Settlement Agreement, the parties seek to resolve

21   claims relating to the following two settlement classes, representing both (a)

22   advertisers who had advertisements hosted and (b) publishers who hosted

23   advertisements on Defendants' networks between April 20, 2003 and July 22, 2008.

24   Friedman Decl., Ex. A at ¶¶ 2, 16.

25   The proposed Settlement Classes satisfy the requisite elements of Rule 23(a) –

26   numerosity, commonality, typicality and adequacy of representation.  *See In re*

27

28

- 21 -

1  *United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D.

2  251, 253 (C.D. Cal. 1988).

3       Plaintiffs of each class easily satisfy the **numerosity** requirement.  Fed. R. Civ.

4  P. 23(a)(1).  Defendants' records indicate that it had over a half million Publishers

5  and approximately 5,000 Advertisers who either hosted ads or had their ads hosted,

6  respectively, during the class period.  Friedman Decl., ¶ 16.  Plaintiffs therefore

7  contend that each of the proposed Advertiser and Publisher Settlement Classes

8  satisfies the numerosity requirement of Rule 23(a).

9       Each class of Plaintiffs also meets the **commonality** requirement.  Fed. R. Civ.

10  P. 23(a)(2).  Commonality exists when there is either a common legal issue

11  stemming from divergent factual predicates or a common nucleus of facts resulting

12  in disparate legal remedies within the class.  *Hanlon* 150 F.3d at 1019-20; *see also*

13  *Amchem,* 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases

14  alleging consumer fraud . . . .").  Where a complaint alleges a "common course of

15  conduct" that affects members of the class in the same manner, common questions

16  predominate.  *Blackie v. Barrack*, 524 F.2d 891, 905-908 (9th Cir. 1975).  Here,

17  Defendants' conduct – improperly calculating commissions, failing to enforce

18  Defendants' own rules prohibiting adware and failing to take appropriate measures to

19  prevent commission theft – is equally relevant to each class member's claims and

20  damages.  That different members of the Settlement Classes may have been harmed

21  in different amounts, at different times, or by different types of adware, does not

22  preclude a finding that common issues predominate, because a **continuous and**

23  **common course** of conduct has been alleged.  *Harris v. Palm Springs Alpine Estates,*

24  *Inc.*, 329 F.2d 909, 914-15 (9th Cir. 1964); *Blackie*, 524 F.2d at 902 (endorsing the

25  approach taken by the court of appeals in *Harris*); *see also In re Indep. Energy*

26  *Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 486 (S.D.N.Y. 2002) (holding that

27  predominance requirement was easily satisfied in cases where claims were based on

28

a common theory of misrepresentations and omissions, even though damage amounts might vary).

Plaintiffs' claims are also ***typical*** of those of their respective Settlement Classes because, like all members of the Settlement Classes, they arise from a single course of conduct and are based on the same legal theories. Fed. R. Civ. P. 23(a)(3). In *Hanlon*, the Ninth Circuit explained that "[u]nder [Rule 23's] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." 150 F.3d at 1020.

Here, the same course of conduct gave rise to the proposed Class Representatives' and proposed Settlement Class members' claims. *See, e.g.*, FAC, ¶¶ 2, 79. Plaintiff Carrier was a publisher who successfully hosted ads for her Advertisers and thus earned commissions. *Carrier* FAC, ¶ 37. Plaintiff Natural Area Rugs was an Advertiser who engaged Publishers to host its ads and paid commissions to those Publishers. FAC, ¶¶ 71, 73-74. Both named Plaintiffs allege that they were damaged by Defendants' failure to properly account for transactions and enforce the rules and policies regarding adware. All members of the Settlement Classes were affected by Defendants' common course of conduct. As a result, the named Plaintiffs' claims are typical of those of the Settlement Classes.

Finally, the proposed Class Representatives have "fairly and adequately protect[ed] the interests of the class." Fed. R. Civ. P. 23(a)(4). The ***adequacy*** prong is satisfied where a "suit [is not] collusive and plaintiff's interests [are not] antagonistic to those of the remainder of the class." *United Energy*, 122 F.R.D. at 257. Here, the proposed settlement does not present any antagonism or disabling conflict between the proposed representative plaintiffs and the absent class members. *See Lubin v. Sybedon Corp*., 688 F. Supp. 1425, 1461 (S.D. Cal. 1988); *Weinberger v. Jackson*, 102 F.R.D. 839, 844-45 (N.D. Cal. 1984). Each of the proposed class

1     representatives has the same claims as the members of the settlement class they seek

2     to represent.  Accordingly, Plaintiffs believe the interests of the Settlement Classes

3     will be fairly and adequately protected.  Fed. R. Civ. P. 23(a)(4).

4         **2.    The Settlement Classes Satisfy the Prerequisites of Rule 23(b)(3)**

5         The class action device proposed here "is superior to other available methods

6     for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As

7     described above, common issues predominate throughout both of the settlement

8     classes.  To determine superiority, pertinent factors for the court to consider include:

9             (A) the class members' interests in individually
              controlling the prosecution or defense of separate actions;

10/11           (B) the extent and nature of any litigation concerning
              the controversy already begun by or against class members;

12            (C) the desirability or undesirability of concentrating
              the litigation of the claims in the particular forum; and

13            (D) the likely difficulties in managing a class action.

14    Fed. R. Civ. P. 23(b)(3).  Here, each Settlement Class is far too numerous, and the

15    typical claim is likely too small for each individual member to maintain a separate

16    action, especially given the sheer volume of highly-technical data analysis that

17    would be required to support the claims.  Further, the nationwide geographical

18    dispersion of class members makes it desirable that litigation of the claims involved

19    be concentrated in this forum to mitigate the risk of inconsistent judgments.  Courts

20    have recognized the superiority of the class action device in cases, like the ones here,

21    involving "complicated and imaginative rather than straightforward" allegations.

22    *Blackie*, 524 F.2d at 904 n.19.

23        Employing the class device here will not only achieve economies of scale for

24    Class members, but will also conserve the resources of the judicial system and

25    preserve public confidence in the integrity of the system by avoiding the waste and

26    delay of repetitive proceedings and prevent the inconsistent adjudications of similar

27    issues and claims.  *See Hanlon*, 150 F.3d at 1023.  There is no other mechanism by

28

- 24 -

which all of the Settlement Class members' claims will be as fairly, adequately and efficiently resolved as through a class action.

**C.    The Court Should Appoint Plaintiffs' Counsel as Class Counsel**

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(A), (B). In making this determination, the Court must consider:

> [W]ork counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  As detailed in the firm resumes presented to the Court, Plaintiffs' co-counsel have significant experience in litigating class actions.  *See* Friedman Decl., Ex. K; Nassiri Decl., Ex. A.  Plaintiffs' co-counsel have diligently investigated, prosecuted, and settled this litigation, dedicated substantial resources to the investigation and prosecution of the claims at issue in the litigation, and demonstrated their knowledge of the contract and consumer protection laws at issue. Accordingly, Plaintiffs request that this Court appoint Hagens Berman Sobol Shapiro LLP and Nassiri & Jung LLP as Class Counsel for both the Advertiser and the Publisher Settlement Classes.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court (a) grant final approval of the proposed settlement, (b) certify the Advertiser and Publisher Settlement Classes for settlement purposes, and (c) appoint the petitioning Plaintiffs and their Counsel as Lead Plaintiffs and Class Counsel, respectively. DATED this 26th day of November, 2008.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Jeff D. Friedman_____
JEFF D. FRIEDMAN

- 25 -

001969-12 271648 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shana E. Scarlett (217895)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

NASSIRI & JUNG LLP
Kassra P. Nassiri (215405)
Charles H. Jung (217909)
251 Kearny Street, Suite 501
San Francisco, CA  94108
Telephone: (415) 373-5699
Facsimile:  (415) 534-3200
knassiri@nassiri-jung.com
cjung@nassiri-jung.com

Co-Lead Class Counsel

- 26 -

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26th, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

_____/s/ Jeff D. Friedman_____
JEFF D. FRIEDMAN

001969-12 271648 V1

# Mailing Information for a Case 2:07-cv-02638-FMC-CT

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **S Ashlie Beringer**
  aberinger@gibsondunn.com

- **Jaime Dodge Byrnes**
  jbyrnes@gibsondunn.com,rmcbain@gibsondunn.com

- **Jeff D Friedman**
  jefff@hbsslaw.com

- **Reed R Kathrein**
  reed@hbsslaw.com

- **Kassra Powell Nassiri**
  knassiri@nassiri-jung.com

- **G Charles Nierlich , III**
  gnierlich@gibsondunn.com

- **Shana E Scarlett**
  shanas@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Scott Patrick Barlow
ValueClick Inc
30699 Russell Ranch Rd. Ste 250
Westlake Village, CA 91362

Charles H Jung
Nassiri & Jung
251 Kearny Street, Suite 501
San Francisco, CA 94108

Gail E Lees
Gibson Dunn & Crutcher
333 South Grand Avenue, 45th Floor
Los Angeles, CA 90071-3197
```